**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
EMAIL ACCOUNT:

**chris@caharrisoncompanies.com**

THAT IS STORED AT PREMISES
CONTROLLED BY GOOGLE LLC

Case No. 3:23-sw-56

**Filed Under Seal**

FILED

Mar 28 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan Furr, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with the email account chris@caharrisoncompanies.com ("Target Account") that is stored at premises owned, maintained controlled, and operated by Google LLC ("Google"), a web-based electronic mail service provider located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.    Your Affiant is a Special Agent with the Federal Bureau of Investigation ("FBI") currently assigned to the Richmond Field Office in Richmond, Virginia. I have been employed with the FBI since 2011. I am currently assigned to work investigations of complex financial crimes. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in white collar crime, cyber-crime, interviewing, evidence collection, intelligence analysis, and legal matters, among other topics. By virtue of my FBI employment, I have performed a variety of investigative tasks, including conducting arrests and executing Federal search warrants. As part of my duties with the FBI, I investigate violations of federal law, including wire and mail fraud, bank fraud, securities fraud, conspiracy, and money laundering. I am also a licensed certified public accountant ("CPA").

4.    I am a "federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, and I am authorized to execute warrants issued under the authority of the United States.

5.    The facts set forth in this affidavit are based upon my training and experience, my personal knowledge of this investigation, and my review of records, documentation, and information provided to me from others, including email correspondence, financial and business records, and in-person interviews.

6.    Since this affidavit is being submitted for the limited purpose of securing a search warrant, the information within is limited in scope to information relevant to this purpose, and I have not included every fact known to me or others concerning this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Finally, all dates and times referenced throughout the affidavit are approximate.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Target Account, identified in Attachment A, contains evidence of a scheme to defraud investors and financial institutions, in violation of 18 U.S.C. §§ 1343 (wire fraud) and 1344 (bank fraud) (collectively, "Subject Offenses").

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. Christopher Harrison is the founder, sole member, and manager of The C.A. Harrison Companies, LLC ("CAHC"). According to its website, CAHC is a regional real estate investment and development company that specializes in renovating historic properties into residential, retail, and mixed-use commercial space.

10. In 2017, Harrison and CAHC became interested in purchasing the Model Tobacco complex and converting it into apartments and commercial space. The Model Tobacco complex is a fifteen-acre collection of seven buildings located in Richmond, Virginia, within the Eastern District of Virginia. The centerpiece of the complex is a six-story art deco building constructed between 1938 and 1940. The complex previously served as a factory for the United States Tobacco Company before it shut down several decades ago.

### Investors S.S. and M.K.

11. In late 2017, Harrison approached two real estate investors, S.S. and M.K., about investing in the Model Tobacco project. Harrison described the project to S.S. and M.K. as

3

"shovel-ready." In the construction industry this phrase is used to describe a project that is considered to be at an advanced enough stage of development for building to begin soon. This generally implies that the planning stage is mostly complete, the required permits are in place, and that work will be ready to begin once funding is in place. Harrison told S.S. and M.K. that the land and construction financing were ready to go, that Harrison had already applied to the bank, and that Harrison was working with the bank to provide the required guarantees. Harrison said the acquisition of the Model Tobacco site would close in early 2018 and the entire project would be complete by late 2019. Harrison touted his own credentials and claimed to have significant experience in developing projects similar in size and scope to Model Tobacco property, such as Plant 64 Apartment Homes in Winston-Salem, North Carolina.

12.     In addition to having several phone calls with S.S. and M.K. to discuss the details of the Model Tobacco project, Harrison also sent emails to S.S. and M.K. throughout the process. Harrison used the Target Account to communicate with S.S. and M.K. via email beginning in at least August 2017. Through S.S. and M.K.'s attorneys, I obtained copies of several emails sent by Harrison to S.S. and M.K. using the Target account.

13.     I obtained a copy of an email with subject title "Re:Model Tobacco" that was dated October 7, 2017 and sent from the Target Account to recipients S.S. and M.K. The email contained an excel spreadsheet attachment that consisted of a "Bank Package," which, among other things, contained a description of the Model Tobacco project, development cost estimates, and cash flow projections.

14.     I obtained a copy of an email with subject title "FW:Draft Support Letter for Model Tobacco" that was dated October 27, 2017 and sent by Harrison using the Target Account to

recipients S.S. and M.K. The email contained a PDF attachment of a signed letter from City of Richmond Mayor Levar Stoney, which offered support for the Model Tobacco project.

15.    As a result of the numerous phone calls and email conversations between Harrison, S.S., and M.K. throughout the fall and winter of 2017, S.S. and M.K. perceived Harrison as a legitimate businessman and believed Model Tobacco to be a secure investment.

16.    After negotiations and relying on Harrison's representations, S.S. and M.K. agreed to each invest $1.6 million into the Model Tobacco project. To that end, Harrison (acting through CAHC), S.S., and M.K. agreed to form Model Tobacco Development Group LLC ("MTDG") to govern and formalize their joint venture, executing an Operating Agreement on or about December 29, 2017.

17.    Schedule A to the MTDG Operating Agreement broke out the ownership interest of MTDG as follows: CAHC (38.46%), S.S. (30.77%), and M.K. (30.77%).

18.    On or about February 16, 2018, CAHC, S.S., and M.K. opened a bank account for MTDG at TD Bank ending in -9899 (hereafter, the "TD Bank account"). Between approximately February 28, 2018 and June 12, 2020, S.S. and M.K. made capital contributions to MTDG totaling approximately $3,226,823 as contractually required by the MTDG Operating Agreement.

19.    The MTDG Operating Agreement, among other things, required all capital contributions and project expenses to be transacted from the TD Bank account. Per the agreement, Harrison was also required to make his capital contributions for MTDG to the TD Bank account.

20.    Harrison, however, refused to use the TD Bank account and instead made false and misleading statements to S.S. and M.K. to make it appear that he was paying for project expenses using his own funds from other bank accounts. In actuality, Harrison began selling equity in MTDG to other investors without the knowledge or consent of S.S. and M.K., and Harrison used

those proceeds to fund project expenditures while representing to S.S. and M.K. that *Harrison* was paying for them as part of *his* contribution. As explained more fully below, Harrison fraudulently induced these other investors to buy purported shares of MTDG through the use of false and misleading operating agreements and fabricated meeting minutes.

21.    I obtained a copy of an email with subject title "Re: Model and Ingleside" that was dated April 24, 2019 and sent from the Target Account to M.K and S.S. In the email, Harrison was responding to M.K.'s concern that Harrison was not utilizing the TD Bank account to make capital contributions and pay expenses related to the Model Tobacco project. Harrison told M.K. that Harrison had made his contribution, stating, "I wired $130K from my account. I also, paid for the VHDA application and sent the architect, construction manager, and civil engineer payments."[1] M.K. responded to Harrison expressing frustration that Harrison was using other bank accounts because it made it difficult to keep track of project expenditures. Harrison replied by reiterating that his pro rata share of equity had been paid, stating again via email that "$130k from my account was wired to the law firm…"

22.    Harrison's aforementioned statements to S.S. and M.K. were false and misleading. In actuality, Harrison had surreptitiously raised money from investor J.W., and used J.W.'s investment to make the $130,000 payment, the payment for the VHDA application, and the payment for the construction manager, even though he represented to S.S. and M.K. that these funds were his own capital contribution.

---

[1] The Virginia Housing Development Authority ("VHDA") is a not-for-profit organization that helps Virginians attain quality affordable housing and partners with developers to provide loan financing for new construction, rehabilitation, and acquisition properties. VHDA provided a $34.7 million construction loan for the Model Tobacco project.

23.    The $130,000 payment that Harrison referred to in his April 24, 2019 email to S.S. and M.K. was not, in fact, a personal contribution as characterized by Harrison in the email. Rather, Harrison had secretly opened up a second bank account almost 7 months earlier under the name of MTDG. This account was opened at SunTrust Bank with the account number ending in -2942 ("SunTrust-2942"). Harrison was the sole owner and signatory for this account.

24.    At no point during the time that S.S. and M.K. were making their capital contributions to the Model Tobacco project were they aware of any other bank accounts that existed for MTDG. Nor did the MTDG Operating Agreement allow for a second bank account for the project.

### Equity Trust Company Investors

25.    I obtained and reviewed bank records for SunTrust-2942. I observed that there were several large deposits into the account between the time Harrison opened it in September 2018 and continuing through June 2019. In particular, there were four large deposits totaling $600,000 that originated from a company called Equity Trust Company ("ETC"). ETC is a private investment company that allows investors to open a self-directed IRA. A self-directed IRA is an account that allows an investor to use retirement funds to make investments beyond traditional stocks and bonds, such as in real-estate, private debt, and private equity-like stock of corporations or LLCs.

26.    I obtained records from ETC that indicated there were at least four individual investors who had opened IRA accounts at ETC and made self-directed investments into MTDG.

27.    From ETC, I obtained a copy of an October 9, 2018 email sent by Harrison to one of the investors, P.L., via the Target Account. The subject title of the email was "Update Equity Trust Documents." Attached to the email was a document titled "Private Equity Representation Letter," which was signed by Harrison as the managing member of MTDG. P.L. invested $50,000

7

in MTDG through ETC. The money invested was instantly transferred to Harrison's secret MTDG account, SunTrust-2942.

28.    I learned that J.W. also opened a self-directed IRA account at the direction of Harrison and made an investment of $250,000 in MTDG on April 23, 2019. That same day, the money invested by J.W. was immediately transferred to SunTrust-2942. The following day, April 24, 2019, $200,000 of this money was transferred from SunTrust-2942 to another SunTrust account ending in -4390 ("SunTrust-4390"). I obtained and reviewed bank records for SunTrust-4390 and observed that the account was owned by "CA Harrison Companies LLC" and that Harrison was the sole owner and signatory of the account.

29.    The aforementioned $200,000 that was transferred to SunTrust-4390 was used on the same day to send a wire for $130,000 to "Beale, Davidson, Etherington, & Morris, PC." This was the same law firm mentioned in the email chain where Harrison claimed to S.S. and M.K. that Harrison had used his account to wire $130,000 to the law firm.

30.    The SunTrust-4390 bank records also indicated that Harrison purchased a cashier's check for $10,000 made payable to VHDA on April 24, 2019. Both this expenditure and the $130,000 payment to the law firm were represented by Harrison to S.S. and M.K. to be expenses that Harrison personally bore and should be counted as his share of the MTDG capital contribution. In both cases, the expenses were paid for using the money that Harrison secretly raised from J.W. by fraudulently selling J.W. purported shares of MTDG without the knowledge and consent of S.S. and M.K.

31.    In order to make a self-directed IRA investment in MTDG, ETC required that an investor/account holder provide a signed operating agreement indicating a schedule of MTDG members and their respective equity interest. Harrison provided operating agreements and/or

meeting minutes to each investor in order for them to submit to ETC. The documents purport to be from MTDG and provide a schedule of members that specifies each investor's contribution amount and equity share of MTDG.

32.    J.W. provided ETC with a document titled "Minutes of the April 17th, 2019 Special Meeting of the Members of Model Tobacco Development Group, LLC." The document, which was signed by Harrison and J.W., stated that a special meeting of MTDG was held in person and that Harrison was in attendance as the sole member of MTDG. The attached schedule of MTDG members indicated just two members: Harrison with a cash contribution of $1,000,000 and J.W. with a cash contribution of $250,000.

33.    The other MTDG investors submitted similar documents to ETC, all indicating that Harrison was the sole member of MTDG and providing member schedules, which omitted that S.S. and M.K. were each 30% equity shareholders of MTG. The documents that Harrison provided these investors were false, misleading, and/or fabricated, and they presented a false picture of the equity breakdown of MTDG. The falsehoods and misrepresentations in these documents deceived investors into believing they had purchased a larger ownership interest in MTDG than they actually had.

### *Misuse of Investor Funds*

34.    More than just using the ETC investor money to deceive S.S. and M.K. into thinking that he was making his contractually obligated contributions to MTDG, Harrison also used these funds to pay for expenses unrelated to Model Tobacco. For example, yet another ETC investor, J.M., bought a $250,000 stake in MTDG through ETC. On or about May 29, 2019, J.M. deposited his $250,000 investment into SunTrust-2942. The following day, Harrison used

$200,000 of those funds to send a wire to a title insurance company, with the wire referencing "Whitaker Park."

35.    Public reporting gathered during this investigation has revealed that Whitaker Park is an entirely different real estate project in North Carolina that Harrison was spearheading. The Whitaker Park project has no apparent connection to the Model Tobacco project or its investors. J.M's investment was specifically intended for the Model Tobacco project, not other projects sponsored by Harrison.

36.    Harrison also used investor money to cover past due obligations related to failed projects. Santorini Capital LLC ("Santorini") was a real estate financing company owned by S.S. and M.K. In 2017, Santorini lent over $1 million to Harrison for a real estate project in Washington D.C. Long delinquent on his debt obligations to Santorini, Harrison used MTDG investor money from J.W., which was earmarked for the Model Tobacco project, to make interest payments to Santorini.

37.    Harrison also used funds invested by J.W. to wire over $46,000 to various other individuals that Harrison was indebted to, including C.C., K.S., and W.W. At least two of the wire transfers referenced "loan interest repayment."

38.    On August 15, 2019, Harrison, via the Target Account, sent an email to S.S. for an additional cash call. Harrison explained that MTDG had been fully approved for a $33 million loan from the VHDA and that the loan commitment would require a 3% commitment fee, or $990,000, to be paid to VHDA, after which they would have 30 days to close on the loan. Based

on this representation and expressed urgency from Harrison, S.S. and M.K. made combined capital contributions of $635,986 into the TD Bank account.[2]

39.     Also on August 15, 2019, S.S. inquired of Harrison about the status of the Model Tobacco land contract, which was set to expire that day. Harrison had entered a purchase agreement to buy Model Tobacco in August 2017; since that original contract, Harrison had been granted numerous extensions by Model Tobacco's seller, and MTDG had paid $900,000 in extension fees and deposit fees over that period. Most of these fees were funded by S.S. and M.K. contributions. S.S. inquired as to whether the seller would extend the contract. Harrison replied via email, using the Target Account, that: "Now that a loan commitment is in place, the owner has agreed to extend the closing for a reasonable time period."

40.     What Harrison did not disclose to S.S. and M.K. is that on that same day, Harrison and the seller of Model Tobacco signed Addendum VII to the original purchase agreement, which extended the closing date to December 31, 2019, but only at the cost of a $75,000 increase in the purchase price and the designation of $50,000 of previously made deposits as non-refundable fees rather than applying to the purchase price of the property (bringing the grand total to $300,000 of non-refundable fees). Even as Harrison signed Addendum VII that day, Harrison had still yet to pay $175,000 in non-refundable deposits to the seller that were due based on a prior addendum to the purchase agreement.

41.     Despite collecting over $630,000 from S.S. and M.K. after telling them that the loan commitment fee would cost over $900,000, Harrison paid only $225,000 to VHDA via a cashier's check dated October 12, 2019. With the remaining funds, Harrison wired $175,000 to

---

[2] VHDA would not actually close on the loan until nearly 14 months later.

11

Beale, Davidson, Etherington, & Morris, PC to pay the non-refundable deposits that were owed to the seller of the Model Tobacco property and purchased three cashier's checks totaling over $205,000, which he subsequently deposited into a personal checking account held in his name at Navy Federal Credit Union ending in -2288 ("Navy-2288").

42.     From the Navy-2288 account, Harrison used S.S.'s and M.K.'s funds to make several personal expenditures, including, but not limited to, $5,500 for school tuition for his daughter, a nearly $8,000 mortgage payment for his personal residence, over $3,000 in clothing stores, and approximately $10,000 of cash withdrawals. Harrison also used $45,250 to pay back C.C., K.S., and W.W. (all previously mentioned above) who all loaned Harrison funds.

43.     Of the $205,000 transferred to Navy-2288 via the aforementioned cashier's checks discussed above, Harrison subsequently transferred $90,500 to an account at Bank OZK ending in -6186 held in the name of CAHC. From this account, Harrison used those same funds to make a payment of $17,253.75 to Santorini on October 24, 2019. In essence, and unbeknownst to them, Harrison was using S.S. and M.K's own money (invested for the purposes of MTDG) to make debt payments that he owed to them on another real estate project (Santorini).

44.     After detailed reviews of the aforementioned bank accounts, I identified numerous additional instances where Harrison purported to S.S. and M.K. to have made personal contributions toward the Model Tobacco project when, in fact, Harrison rarely used his own funds. Instead, Harrison's many other projects and bank accounts created a complex web of commingling of funds from various different investors and sources, which allowed him to shift resources in such a way that he routinely used someone else's money to pay his own obligations.

45.     By June of 2020, Harrison was finally nearing closing the deal on the Model Tobacco property purchase which included $6.5 million in financing from Allegacy Federal Credit

12

Union. In order to close, MTDG was required to bring $1.36 million to settlement. S.S. and M.K. together were required to make additional cash contributions over $900,000 to use at closing. Harrison was required to contribute approximately $450,000. However, Harrison did not have the money and was forced to enter into a direct financing agreement with the seller of Model Tobacco. Harrison executed a promissory note in favor of the seller. The note was collateralized by a piece of land – comprising of several parcels – adjacent to Model Tobacco known as the Brinser Street Property.

46.      Unbeknownst to S.S. and M.K., Harrison had purchased the Brinser Street Property back in March of 2018 for approximately $190,000. Despite the fact that the majority (approximately $155,000) of the funds used to purchase this property came from S.S. and M.K., Harrison titled the property under Brinser Street, LLC, an entity Harrison held 100% ownership interest in while S.S. and M.K. held zero.

### *Misuse of Model Tobacco Loan Proceeds*

47.      With the Model Tobacco property now acquired, Harrison began working on securing the funding to complete the renovation and construction work required to transform Model Tobacco into residential and commercial space. This would eventually result in over $50 million of bank funding by several different financial institutions and would usher in a new phase of Harrison's scheme to defraud others.

48.      One of the key sources of funding for the project was through a combination of state and federal historic tax credits ("HTCs") anticipated to generate approximately $19 million of the total anticipated $52 million in development costs. A tax credit investor purchases HTCs from a developer at a discount and typically may fund up to 25% of the purchase price up front, which can be used as a source of funds by the developer. The remaining amount is deferred over

13

time, typically over the course of the development. A developer may then obtain a tax credit bridge loan that is secured by the remaining payment stream from the tax credit investor.

49.    On or about October 28, 2020, MTDG closed on a tax credit bridge loan with Cedar Rapids Bank & Trust ("CRBT") based in Cedar Rapids, Iowa. The purpose of the loan was to finance the construction and rehabilitation related to the Model Tobacco project. The loan agreement was executed and signed by Harrison acting as Manager for McKenzie Blake Development Company, LLC ("MBD").[3]

50.    By signing the loan agreement, MTDG made certain representations and warranties to CRBT. Each member of MTDG was required to make these representations and warranties, including Harrison, S.S., and M.K. At no time during the loan application or loan process, up to and including the signing of the loan agreement, did Harrison disclose to CRBT that additional members of MTDG existed, including J.W., C.L., J.M., or other ETC investors.

51.    From December 8, 2020 through October 8, 2021, CRBT funded a total of 11 loan draws to MTDG, totaling approximately $11,916,704. Per the loan agreement, loan proceeds were to be used solely to pay costs and expenses incurred by the borrower (MTDG) in connection with the rehabilitation of the Model Tobacco property. Furthermore, the loan agreement dictated that no proceeds of the loan should be used to pay any management, development, or contractor fees to the borrower, manager, managing member, or to any affiliate.

---

[3] MBD had previously been authorized by MTDG to execute construction financing closing documents related to the project. MBD was another real estate development company for which Harrison was the sole member and manager.

52.    Draw requests to CRBT were made by Harrison via email using the Target Account. A draw request includes documents such as budgets, schedules, progress reports, architect's certification for payment, contractor's application for payment, invoices, and change orders. The purpose of the draw request and accompanying documentation is for the lender to review the expenses for accuracy and to ensure that work was completed. Once approved, the lender wires funds to the borrower.

53.    I obtained an email dated March 3, 2021 sent from the Target Account to B.C., an employee at CRBT. The subject line of the email was "FW: Model Tobacco Cedar Rapids Draw 4 Link." In the body of the email, Harrison provided a link to a draw request and also attached several documents to the email. The documents provided by Harrison included what is known as a "G702" form. This is a standard billing form that serves as a contractor's application and certificate of payment, indicating that payment is due. In particular, the documents in the email included a G702 form for Virginia Demolition. The G702 form indicated that Virginia Demolition was applying for a payment of $53,333.33 plus an additional $291,000 for a change order for a total payment of $344,333.33. Also attached to the draw request package was an invoice from Virginia Demolition dated March 1, 2021 indicating a total amount due of $291,000.

54.    This email submission by Harrison, which also included other contractor invoices, caused CRBT to wire a total of $2,092,584.66 to Harrison on March 5, 2021. The funds were wired to an account ending in -2291 held by MBD at Navy Federal Credit Union ("NFCU-2291").

55.    On March 8, 2021, Harrison purchased a cashier's check payable to Virginia Demolition for $344,333.33 using funds from NFCU-2291. On that same day, Harrison deposited the cashier's check into an account ending in -3370 held in the name of Virginia Demolition at

Navy Federal Credit Union ("NFCU-3370"). Based on records obtained from NFCU, Harrison is the sole owner and authorized signer for the NFCU-3370 account.

56.    From December 2020 through October 2021, Harrison's draw requests caused CRBT to wire a total of $11.9 million to MBD. Of that total amount, approximately $2.3 million related to work completed by Virginia Demolition and was subsequently deposited from MBD's account, NFCU-2291, to Virginia Demolition's account, NFCU-3370.

57.    Public records obtained from the Virginia State Corporation Commission indicate that Virginia Demolition was registered in the state of Virginia on October 26, 2020, approximately 43 days before Harrison made his first draw request to CRBT which included payment for Virginia Demolition expenses.

58.    Based on my investigation, Virginia Demolition is an alter ego of Harrison. Virginia Demolition does not own property or demolition equipment, and they do not have any employees. A review of the bank records for Virginia Demolition (NFCU-3370) indicates that Virginia Demolition is a shell company that subcontracts other demolition companies to perform contract work related to projects being developed by Harrison.

59.    Between October 2020 and June 2022, the Virginia Demolition account received net revenues of approximately $2.6 million. During this same period, over $678,000 was either transferred to Harrison's personal account (NFCU-2288) or withdrawn in cash. Also during this time period, over $340,000 of these funds were used to repay other lenders, including (but not limited to) previously mentioned lenders C.C. and K.S.

60.    After the final CRBT loan draw was issued to Harrison through MBD in October of 2021, Harrison continued to communicate with B.C. regarding various matters. For example,

on May 4, 2022, B.C. informed Harrison that the interest reserve remaining on the loan was short over $47,000 and would not be sufficient for an upcoming interest payment.

61.      Harrison used the Target Account on May 26, 2022 to respond to B.C. and ask for wiring instructions in order to pay the difference. That same day, Harrison paid the shortage of funds. However, the NFCU-2291 records indicate that the funds Harrison used to pay this obligation were actually the proceeds from another construction loan: the VHDA loan.

62.      On May 17, 2022, Harrison sent an email from the Target Account to D.G., a loan officer at VHDA. In the email, Harrison requested funds totaling $597,129 in order to pay for upgrades that he wanted to have in place before the grand opening of Model Tobacco. The itemized list of upgrades Harrison provided included items such as mail locker installation, surveillance system installation, gym equipment, and a climbing wall. None of the funding requested by Harrison included anything regarding interest payments to be paid to CRBT. The loan advance was approved by VHDA and the $597,129 was posted to NFCU-2291 on May 23, 2022.

63.      While Harrison used a portion of the VHDA loan proceeds to pay the claimed expenses, within 24 hours of receiving the money, Harrison withdrew $10,000 in cash, transferred $20,000 to his personal account, NFCU-2288, purchased a $48,000 cashier's check made payable to Diamond Exchange, USA, a custom jeweler and diamond seller, and paid $60,000 to a partner in a project entirely unrelated to Model Tobacco.

64.      The bridge loan made by CRBT to Harrison matured on February 27, 2023. Just days prior to this due date, Harrison emailed B.C. from the Target Account to inform B.C. that he would not be able to make the loan repayment and asked for a 90-day extension.

65.      A preservation request to Google for the Target Account, chris@caharrisoncompanies.com, was made under 18 U.S.C. 2703(f) on March 2, 2023.

66.     In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

### *Misrepresentations Regarding Target Account*

67.     Harrison is presently engaged in civil litigation against S.S. and M.K. in this Court concerning the Model Tobacco project. *See* Case No. 3:22-cv-405-DJN.  Before the complaint in this case was filed, on or about March 25, 2022, Harrison was provided with a preservation notice by S.S. and M.K.'s lawyers, sent to the Target Account via email, requesting the preservation of "all documents related to Model Tobacco in your custody, possession or control."  Case No. 3:22-cv-405-DJN, ECF No. 59-2.  Civil litigants thereafter filed a complaint on May 31, 2022. *Id.*, ECF No. 1.

68.     As part of a discovery dispute concerning the non-production of emails – including email from the Target Account and other @caharrisoncompanies.com email accounts – on or about February 24, 2023, Harrison signed a sworn Affidavit, stating in relevant part: "Throughout the years, I have changed document and email servers; the last time I changed e-mail servers was in 2020, when I changed to Microsoft outlook and went to the cloud.  In doing so, old e-mails were not always saved, which has created complications in terms of retrieval . . . I understood that once a case was filed, I should not dispose of any documents, and have not done so. . . I declare under penalty of perjury to the best of my knowledge that the foregoing is true and correct."  Case No. 3:22-cv-405-DJN, ECF No. 124-6.

69.     Utilizing public domain tools that capture information regarding the hosting of emails on particular servers, the FBI obtained information indicating that the Target Account and

other @caharrisoncompanies.com email accounts were hosted by Google until at least April 1, 2022. On or about April 4, 2022 – approximately 10 days *after* Harrison was served with a preservation notice – the @caharrisoncompanies.com email account was migrated over to the Microsoft Corporation.

70.    Misrepresentations regarding the true host of the Target Account in the civil litigation and the timing of the migration of the @caharrisoncompanies.com server to Microsoft Corporation are material to the Subject Offenses.  Specifically, the misrepresentation suggests deliberate concealment of information contained on the Target Account – information related to investor dealings with the Model Tobacco project.

## BACKGROUND CONCERNING EMAIL

71.    In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts at the domain name @gmail.com or at custom domain names, like the email account listed in Attachment A.  Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

72.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

emails), and other files, on servers maintained and/or owned by Google. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

73.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

74.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

75.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

76.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or

exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

* * * * *

## CONCLUSION

77.     Based on the forgoing, there exists probable cause to search the information described in Attachment A for evidence, fruits, contraband, and/or instrumentalities of the Subject Offenses, as further described in Attachment B.  Accordingly, I respectfully request that the Court issue the proposed search warrant.

78.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Google.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Ryan Furr
Special Agent
FBI, Richmond Field Office
U.S. Department of Justice

Subscribed and sworn to me by telephone on March 28, 2023.

/s/

Hon. Roderick C. Young
United States District Judge

23

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the email chris@caharrisoncompanies.com that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Google LLC (the "Provider")**

        To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on **March 2, 2023,** the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

        a.      The contents of all emails associated with the account from August 1, 2017 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

        b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

        c.      The types of service utilized;

        d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

2

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services, contacts related to hosting the account, and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence and fruits of violations of the Subject Offenses, including information pertaining to the following matters:

(a) Information and correspondence related to any of the following individuals and entities: Christopher Harrison, the C.A. Harrison Companies, LLC, McKenzie Blake Development Company, Model Tobacco Development Group LLC, and Virginia Demolition;

(b) Information and correspondence related to any of the following entities, and the investors, employees, and associates therein: Whitaker Park, Model Tobacco, Brinser Street Properties, Equity Trust Company, Virginia Demolition, Santorini Capital LLC, C.A. Harrison Companies, LLC, McKenzie Blake Development Company, Plant 64 Apartment Homes, and Model Tobacco Development Group LLC;

(c) Information and correspondence related to current and potential vendors to the Model Tobacco project, including but not limited, correspondence with construction companies, contractors, and subcontractors;

(d) Information and correspondence related to the commingling, transfer, and use of funds designated for the Model Tobacco project, including investor funds and loan proceeds;

(e) Information and correspondence relating to the migration of @caharrisoncompanies.com to alternative Providers;

4

(f) Evidence indicating how, when, and where the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(g) Evidence indicating the email account owner's state of mind as it relates to the crimes under investigation; and

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts located anywhere in the United States. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team and the investigative team may resume its review. If the filter team decides

5

that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team. Absent unusual circumstances, the government will provide the putatively protected documents to the privilege holder if and when they are provided to the court for further action. If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to court for judicial review.